1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   RUDY GRANT KIRBY,                    No.  2:11-cv-3362 JAM GGH P

12              Petitioner,

13       v.                              FINDINGS AND RECOMMENDATIONS

14   G.D. LEWIS,

15              Respondent.

16

17

18   *Introduction and Summary*

19           Petitioner, Rudy Kirby, seeks habeas corpus relief from his conviction for discharging a

20   weapon into an inhabited dwelling, (Cal. Penal Code § 246), a gang enhancement associated with

21   the previous charge found to be true, (Cal. Penal Code § 186.22(b)(1)), and a felon in possession

22   of a firearm (Cal. Penal Code § 12021 (a)(1)).  An attempted murder charge resulted in a mistrial,

23   and no new trial was had on this charge.  In a separate trial, petitioner was found guilty of a strike,

24   (Cal. Penal Code § 667 section (1)).  He was sentenced 15 years to life on the discharge/gang

25   enhancement doubled to 30 years to life on account of the prior strike.  A concurrent six year

26   term, suspended, was assessed on the felon in possession charge.

27   /////

28

                                    1

Petitioner claims that his trial was flawed from a federal constitutional perspective because:

    1.      Accomplice testimony was not sufficiently corroborated;

    2.      The trial court erred in refusing to give an accomplice charge jury instruction modified as desired by petitioner;

    3.      The trial court erred in giving jury instructions on consciousness of guilt and flight;

    4.      A defective <u>Allen</u> charge was given to a deadlocked jury.

With the exception of Claim 4, none of the asserted claims states a cognizable claim in federal habeas corpus as there exists no established Supreme Court authority authorizing such claims.  The <u>Allen</u> charge claim fails on the merits.

*Factual Background*

The factual background is taken from the opinion of the Court of Appeal on direct review:

> We summarize the evidence in the light most favorable to the judgment. (<u>People v. Hatch</u> (2000) 22 Cal.4th 260, 272.) As defendant raises no issues relating to the gang enhancement, we summarize only the portion of the submitted gang evidence that is relevant to our consideration of the corroboration of the statements and testimony of Tyler and Jenna.
>
> Tyler, Fernando N., and Landon M. were students together in auto shop class at a high school in Elk Grove. One Thursday in February 2008, Landon was caught with marijuana and he blamed Fernando for being a "snitch." After the class ended, Tyler, a friend of Fernando's, heard Landon call Fernando a "scrap." A "scrap" is a derogatory term for a Sureño gang member, treated by Sureños as essentially fighting words. Tyler told Fernando about Landon's comment.
>
> After school that day, when Tyler met Fernando to give him a ride home in his car, they saw Landon riding his bicycle. They followed Landon. Tyler pulled alongside of Landon and told him that Fernando wanted to talk to him. Landon kept riding and ignored them. Tyler and Fernando followed Landon until they ended up at a house on Halverson Drive. Fernando told Tyler to leave, as he knew Norteño gang members lived at the house (the Norteños are a rival gang to the Sureños).

2

Meanwhile, Landon knocked at the door of the house. Mario Rosales, a friend of Landon's and a Norteño gang member, answered the door. Rosales testified Landon was out of breath and appeared scared and panicked. Landon told Rosales that some guys were after him in a blue Mustang; Rosales saw a blue Mustang turn the corner and drive by the house. Rosales agreed to help Landon as long as trouble did not come back towards him or his house.

The next day at school, it was rumored something was going to happen, that Tyler and/or Fernando were going to get "jumped." Tyler called his older cousin, Andy Martinez, and told him about the conflict with Landon. Tyler wanted to see if Martinez "could have [his] back." Martinez is a Sureño.

That evening Tyler, Tyler's girlfriend Jenna, and Fernando went out, using Jenna's mother's SUV—a silver Honda Pilot. At Martinez's request, Tyler drove to Martinez's apartment and picked him up. Martinez told Tyler that they were going to "handle this problem tonight." Tyler, Jenna, Fernando and Martinez went to a tobacco bar where Tyler talked to Martinez further about the conflict. As they continued talking, Martinez started telephoning people. When Martinez hung up, he told Tyler they were going to pick up some "homies." They dropped Fernando at his home and then drove to a house on Mary Lou Way in the Meadowview area.

When they arrived at the house, Martinez went inside while Tyler and Jenna stayed in the Honda. Martinez subsequently came outside with defendant, whom he introduced to Tyler and Jenna as "Loco." Defendant invited them inside the house to "chill for a bit." Inside, Tyler noticed a lot of graffiti on the walls, some of which was gang related. Martinez talked to defendant about the conflict between Tyler, Fernando, and Landon. Martinez told Tyler he did not have to worry about it anymore as "[w]e're going to do something about it." Defendant kept going back and forth from a bedroom to the living room, sometimes talking on his cell phone and one time carrying a sawed-off shotgun. People watched defendant and moved quickly out of his way. Defendant was the only one to handle the shotgun.

Tyler and Jenna wanted to leave, but Martinez told them to stick around. Eventually Martinez said they could leave, but as they were doing so, at least five Hispanic males, who appeared to be in their early 20's, entered the house. The men introduced themselves and said they were from the "BST" clique. Tyler and Jenna remained at the house.

Sometime later, defendant said, "Let's go," and everyone stopped what they were doing and followed defendant outside. As defendant left, he was

carrying a green duffel bag, which he placed in his light gray or tan Suburban. Defendant told Tyler to follow him as he had only paper license plates on the back of the Suburban and he did not want to get pulled over. Defendant and four to five BST clique members got into the Suburban. Tyler, Jenna, Martinez, and at least one person from the BST group got inside the Honda Pilot.

Tyler directed the two cars to Rosales's house on Halverson Drive. The two cars first parked across the street, but then moved to the side of Rosales's house. Everyone except Jenna got out of the cars. Jenna saw someone get a blue or green bag out of the other car. Tyler saw someone with the shotgun he had seen at the house and someone with a handgun, but testified he could not remember who was holding the guns. Tyler told detectives defendant had the shotgun. Most of the men wore blue bandanas. Martinez and Tyler walked up to the front door of Rosales's house.

Rosales was sleeping in the living room of his house. Around 2:00 a.m., he awoke when he heard a knock at the living room window. Figuring it was his older brother coming home, Rosales got up and opened up the front door. Rosales turned to walk back inside. When no one followed him in through the door, he returned to the doorway. Rosales saw two people he had never met before (Martinez and Tyler) standing to the left of the front door. Martinez asked Rosales if he knew their cousin, Fernando. Rosales did not know him, but had heard the name from Landon when the blue Mustang drove by the previous afternoon. Rosales said he did not know who their cousin was, had never met him, and they had the wrong person. Martinez asked Rosales if he was from "RKN," a reference to the Red's Krew Norteño, a subset of the Norteños. Rosales denied being from RKN. Martinez stepped up close to Rosales who had the screen door partially open. Rosales noticed Martinez had a beer in one hand and what appeared to be a knife in the other. Martinez lifted up his shirt to expose a tattoo on his stomach that read "S–U–R" and said that he was "Sur Trece," both references to Sureños. Martinez then punched Rosales in the face.

Almost immediately, there was gunfire, which Rosales thought came from the area of the street corner. Martinez and Tyler ran from Rosales's house. Rosales was hit by one loud shot. Shotgun pellets lodged in his left side. He closed the door and ran back into his house. He heard another boom that shattered the window, followed by more pops. Rosales's mother called 911.

Jenna saw defendant running towards the Suburban after the shots were fired. He got into the driver's seat. Tyler ran down the street and called Jenna. When Jenna picked him up, Martinez was already in the car. After dropping off

4

Martinez at his apartment, Tyler spent the rest of the night at Jenna's house.

Later that day, Elk Grove Police Detective Ryan Elmore, who had received information regarding the shooting, observed a Suburban matching the description of one of the suspect vehicles. Elmore requested back up and followed the Suburban until it stopped at the house on Mary Lou Way in the Meadowview area. Five or six passengers, several of whom were later identified as Sureño gang members, quickly got out of the Suburban. They were hurrying up to the house when they were detained by the other officers who had arrived. Defendant was the driver of the Suburban. He did not run up to the house, but stayed by the Suburban and followed all the commands of the officers.

During a subsequent search of the house on Mary Lou Way, a shotgun inside a green duffel bag was located in the attic crawl space. The shotgun shells collected from the front yard of Rosales's house were forensically matched to the shotgun found in the attic. The fired shotgun was found in Rosales's front yard appeared to be the same as the unfired wads for the shotgun found in the attic.

Also inside the house, officers saw two closet doors covered with Sureño gang graffiti, including "BST," "Sur Trece," "13," and a number of monikers. Defendant's moniker, "Loco," was written right in the middle of one door and was written at the bottom of the other. Another moniker written on the door was "Little Loco." A photograph of defendant and the brother of the tenant of the house on Mary Lou Way was found in a drawer of the dresser in the master bedroom of the house. Several blue bandannas were found in the house. A "gangster's prayer" was located on top of the pool table.

Ronald Aurich, a reserve deputy with the Sacramento County Sheriff's Department, testified as the prosecution's gang expert. Aurich testified he was familiar with the Sureño criminal street gang. Sureños use the number "13" and the color blue, among other things, to symbolize the gang. Aurich testified the BST (Barrio Sur Trece) subset of the Sureños claims territory in South Sacramento.

Aurich testified that a hierarchy of gangsters is common within the various subsets of the Sureño gang. Usually an "OG" (original gangster) or a shot caller will take the leadership role, dictating what and how things will be done. A gang member becomes a shot caller by gaining respect and status within the gang. Status can be increased by putting in "work" for the gang by committing crimes. An arrest will tend to enhance a gang member's status. Being incarcerated for a gang-related crime will improve status. Proving that you are willing to back up

your "homies" will gain respect within the gang. Wearing visible gang tattoos increases status. A person who is seasoned will have more influence because of his age.

Defendant's criminal history reports reflect he has admitted being a Sureño gang member. Defendant told officers he first became a member when he was 15 years old. Since he was 31 or 32 years old at the time of trial, defendant has been a gang member for at least 15 years. Defendant identified himself as a "Southerner," meaning a Sureño, to an officer at the jail pending this trial.

Defendant appears in a number of photographs depicting his Sureño gang affiliation. Defendant's moniker or nickname was "Loco." According to Aurich, there generally will not be multiples of the same moniker within one gang set. Where a younger gang member wants to emulate an older gangster, he may adopt a moniker adding the preface "Little" to the older member's moniker, e.g., "Little Loco." Defendant has "Loco" tattooed two places on his body and a teardrop tattooed by his eye. A teardrop tattoo is sometimes used to show the wearer has been to prison, although it can also have other meanings. Aurich's expert opinion was that gang members who have teardrops tattooed by their eyes display more influence and have more power than the typical gang member.

Defendant admitted doing "dirt" or putting in work for the gang when he was young. In 1995, defendant was involved in criminally threatening an apartment manager who evicted a fellow gang member. In 1998, defendant was involved in an assault and theft.

Defendant went to prison in 2002 after he was convicted of aiding fellow gang members in getting rid of the bodies after a double murder. Aurich opined that the offense demonstrated defendant was a person who was trusted within the gang to be called for help if there was a problem. He had some type of leadership role.

In Aurich's opinion, defendant was a shot caller. Aurich based his opinion on defendant's criminal history, his age, the people he has been connected with before this incident, the 2002 case, and the circumstances of this case.

People v. Kirby, 2010 WL 3280290, * 1-5 (Cal. App. 2010).

/////

/////

6

1     *Discussion*

2        A.   Legal Standards

3        The AEDPA legal standards play a significant role in this habeas case; thus, they are

4     explicated at some length.

5        The statutory limitations of federal courts' power to issue habeas corpus relief for persons

6     in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective

7     Death Penalty Act of 1996 (AEDPA).  The text of § 2254(d) states:

8
> An application for a writ of habeas corpus on behalf of a person in
9
> custody pursuant to the judgment of a State court shall not be
> granted with respect to any claim that was adjudicated on the merits
> in State court proceedings unless the adjudication of the claim-
10

11
> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
12

13
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the
> State court proceeding.
14

15    As a preliminary matter, the Supreme Court has recently held and reconfirmed "that § 2254(d)

16    does not require a state court to give reasons before its decision can be deemed to have been

17    'adjudicated on the merits.'"  Harrington v. Richter, 131 S. Ct. 770, 785 (2011).

18        Rather, "when a federal claim has been presented to a state court and the state court has

19    denied relief, it may be presumed that the state court adjudicated the claim on the merits in the

20    absence of any indication or state-law procedural principles to the contrary."  Id. at 784-785,

21    citing Harris v. Reed, 489 U.S. 255, 265, 109 S. Ct. 1038 (1989) (presumption of a merits

22    determination when it is unclear whether a decision appearing to rest on federal grounds was

23    decided on another basis).  "The presumption may be overcome when there is reason to think

24    some other explanation for the state court's decision is more likely."  Id. at 785.

25        The Supreme Court has set forth the operative standard for federal habeas review of state

26    court decisions under AEDPA as follows:  "For purposes of § 2254(d)(1), 'an unreasonable

27    application of federal law is different from an incorrect application of federal law.'"  Harrington,

28    supra, 131 S. Ct. at 785, citing Williams v. Taylor, 529 U.S. 362, 410, 120 S. Ct. 1495 (2000).

1   "A state court's determination that a claim lacks merit precludes federal habeas relief so long as

2   'fairminded jurists could disagree' on the correctness of the state court's decision." Id. at 786,

3   citing Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S. Ct. 2140 (2004).

4   Accordingly, "a habeas court must determine what arguments or theories supported or …

5   could have supported[] the state court's decision; and then it must ask whether it is possible

6   fairminded jurists could disagree that those arguments or theories are inconsistent with the

7   holding in a prior decision of this Court." Id. "Evaluating whether a rule application was

8   unreasonable requires considering the rule's specificity. The more general the rule, the more

9   leeway courts have in reaching outcomes in case-by-case determinations.'" Id. Emphasizing the

10  stringency of this standard, which "stops short of imposing a complete bar of federal court

11  relitigation of claims already rejected in state court proceedings[,]" the Supreme Court has

12  cautioned that "even a strong case for relief does not mean the state court's contrary conclusion

13  was unreasonable." Id., citing Lockyer v. Andrade, 538 U.S. 63, 75, 123 S. Ct. 1166 (2003).

14  The undersigned also finds that the same deference is paid to the factual determinations of

15  state courts. Under § 2254(d)(2), factual findings of the state courts are presumed to be correct

16  subject only to a review of the record which demonstrates that the factual finding(s) "resulted in a

17  decision that was based on an unreasonable determination of the facts in light of the evidence

18  presented in the state court proceeding." It makes no sense to interpret "unreasonable" in §

19  2254(d)(2) in a manner different from that same word as it appears in § 2254(d)(1) – i.e., the

20  factual error must be so apparent that "fairminded jurists" examining the same record could not

21  abide by the state court factual determination. A petitioner must show clearly and convincingly

22  that the factual determination is unreasonable. See Rice v. Collins, 546 U.S. 333, 338, 126 S. Ct.

23  969, 974 (2006).

24  The habeas corpus petitioner bears the burden of demonstrating the objectively

25  unreasonable nature of the state court decision in light of controlling Supreme Court authority.

26  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002). Specifically, the petitioner "must

27  show that the state court's ruling on the claim being presented in federal court was so lacking in

28  justification that there was an error well understood and comprehended in existing law beyond

8

1   any possibility for fairminded disagreement." Harrington, supra, 131 S. Ct. at 786-787. "Clearly

2   established" law is law that has been "squarely addressed" by the United States Supreme Court.

3   Wright v. Van Patten, 552 U.S. 120, 125, 128 S. Ct. 743, 746 (2008). Thus, extrapolations of

4   settled law to unique situations will not qualify as clearly established. See e.g., Carey v.

5   Musladin, 549 U.S. 70, 76, 127 S. Ct. 649, 653-54 (2006) (established law not permitting state

6   sponsored practices to inject bias into a criminal proceeding by compelling a defendant to wear

7   prison clothing or by unnecessary showing of uniformed guards does not qualify as clearly

8   established law when spectators' conduct is the alleged cause of bias injection). The established

9   Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other

10  controlling federal law, as opposed to a pronouncement of statutes or rules binding only on

11  federal courts. Early v. Packer, 537 U.S. 3, 9, 123 S. Ct. 362, 366 (2002).

12          The state courts need not have cited to federal authority, or even have indicated awareness

13  of federal authority in arriving at their decision. Early, supra, 537 U.S. at 8, 123 S. Ct. at 365.

14  Where the state courts have not addressed the constitutional issue in dispute in any reasoned

15  opinion, the federal court will independently review the record in adjudication of that issue.

16  "Independent review of the record is not de novo review of the constitutional issue, but rather, the

17  only method by which we can determine whether a silent state court decision is objectively

18  unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

19          Finally, if the state courts have not adjudicated the merits of the federal issue, no AEDPA

20  deference is given; the issue is reviewed de novo under general principles of federal law. Stanley

21  v. Cullen, 633 F.3d 852, 860 (9th Cir. 2012). However, when a state court decision on a

22  petitioner's claims rejects some claims but does not expressly address a federal claim, a federal

23  habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the

24  merits. Johnson v. Williams, ___ U.S. ___, 133 S. Ct. 1088, 1091 (2013).

25          B. Corroboration of Accomplice Testimony and Jury Instruction

26          It was conceded at trial that Tyler and Jenna were accomplices as a matter of law.

27  Petitioner believes that the California statute which requires corroborating evidence for

28  accomplice testimony was not sufficiently satisfied in this case, i.e., his conviction was primarily

9

1    based on the testimony of the accomplices for which there was insufficient independent,

2    corroborating evidence.  He also contends that an accomplice instruction modification proposed

3    by his counsel should have been given.  However, there is no need to analyze the state courts'

4    application of its statute to the facts of the case, or the words of the proposed instruction, because,

5    in a sentence, petitioner's claims are not cognizable in a federal habeas corpus action.  Even prior

6    to AEDPA, the lack of corroboration evidence for accomplice testimony was never viewed as a

7    claim derived from the Constitution, and in particular, the due process clause.  It follows that a

8    deficient instruction on the amount/type of corroborating evidence for such accomplice testimony

9    cannot be a federal issue either.

10       California law provides that accomplice testimony alone is insufficient for conviction.

11    Cal. Penal Code § 1111.  CALCRIM 334 requires that accomplice testimony be corroborated.

12    According to this instruction, before the testimony of an asserted accomplice can be considered as

13    evidence against the accused, the jury must decide whether the witness was an accomplice to the

14    crime.  An accomplice is defined "as one who is liable to prosecution for the identical offense

15    charged against the defendant on trial in the cause in which the testimony of the accomplice is

16    given."  Cal. Penal Code § 1111.  Being "subject to prosecution" requires that the witness either

17    personally committed the crime, or knew of the criminal purpose of the person who did commit

18    the crime, and intended to and did, in fact, aid, facilitate, promote, encourage or instigate the

19    commission of the crime, or participate in a criminal conspiracy to commit the crime.  See People

20    v. Carrington, 47 Cal. 4th 145, 190-191, 97 Cal. Rptr. 3d 117 (2009).

21       It is elementary to federal habeas corpus jurisprudence that relief will not lie for alleged

22    errors of state law in conducting a trial.  Estelle v. McGuire, 502 U.S. 62, 71-72, 112 S. Ct. 475

23    (1991).   Only in situations where the error touches upon matters of fundamental fairness can

24    relief be given, and those instances where fundamental fairness is at stake have been interpreted

25    very narrowly.  Id. at 72-73.  Not only is a corroboration rule for accomplice testimony not a

26    matter of fundamental fairness, but federal law, including that of the United States Supreme

27    Court, has long not required evidence beyond that given by an accomplice to sustain a conviction.

28    United States v. Necoechea, 986 F.2d 1273, 1282 (9th Cir.1993).  See also United States v. Fritts,

1    505 F.2d 168, 169 (9th Cir.1974).  "[T]here is no absolute rule of law preventing convictions on

2    the testimony of accomplices if juries believe them." Caminetti v. United States, 242 U.S. 470,

3    495, 37 S. Ct. 192 (1917).  See also United States v. Augenblick, 393 U.S. 348, 352, 89 S. Ct. 528

4    (1969): "When we look at the requirements of procedural due process, the use of accomplice

5    testimony is not catalogued with constitutional restrictions."  Under federal law, the fact that

6    testimony may have been given by an untrustworthy witness or that it was contradicted does not

7    make the testimony itself untrustworthy.  United States v. Lopez, 803 F.2d 969, 973 (9th Cir.

8    1996).  It follows in this AEDPA context, therefore, that a conviction obtained in state court

9    primarily, or only, on accomplice testimony cannot be challenged as a "federal error."  It further

10   follows that a cautionary instruction regarding an accomplice's testimony cannot be a

11   fundamental due process requirement.  Fritts, 505 F.2d at 169.  See also Barco v. Tilton, 694 F.

12   Supp. 2d 1122, 1136 (C.D. Cal. 2010) (accomplice instruction in state criminal case is strictly a

13   matter of state law).

14          After AEDPA, the focal issue is whether the United States Supreme Court has clearly

15   announced a rule which would direct that a particular claim would be encompassed under some

16   part of the Constitution.  There is no rule established by the Supreme Court that corroboration

17   evidence is necessary for accomplice testimony.  Caminetti, supra.  Nor can one say that the need

18   for corroboration, or an instruction regarding that corroboration, implicates fundamental fairness

19   because the federal courts, even prior to AEDPA, refused to find it constitutionally based.  See

20   authority cited above.  Such spells the death knell of these claims.

21          Therefore, because a federal court may not issue the writ of habeas corpus on the basis of

22   a perceived error of state law, the question of whether sufficient corroborating evidence existed to

23   permit the testimony of Tyler and Jenna, or to warrant the giving of an accomplice instruction as

24   it was given by the trial court, is not cognizable in this habeas corpus proceeding.

25          However, one of the pre-AEDPA accomplice corroboration analyses, Laboa v. Calderon,

26   224 F.3d 972, 979 (9th Cir. 2000), citing Hicks v. Oklahoma, 447 U.S. 343, 346, 100 S. Ct. 2227

27   (1980), found that if state law creates an "entitlement" to its application, due process forbids the

28   "arbitrary" application of the state law.  Firstly, the undersigned cannot find any Supreme Court

11

1    authority holding that the <u>Hicks</u> rule applies in the AEDPA context.  This should not be

2    surprising in that nearly every state law regarding criminal process "entitles" a litigant to its

3    application.  There are very few laws passed with the proviso that the statute may be applied, or

4    not, depending on the judge's predeliction on the matter.  The California statute in question, Cal.

5    Penal Code § 1111 admits of no such discretion.  But, if <u>Hicks</u> were to be applied according to its

6    literal terms, the violation of any state criminal process or evidentiary statute would constitute a

7    cognizable federal claim in habeas corpus as long as the adjective "arbitrary" was used to

8    characterize its application.  This cannot be the law as the Supreme Court has stated in the

9    strongest of terms that a violation of state law does not entitle one to federal habeas corpus relief

10   except where that violation implicates the fundamental fairness of the criminal proceeding.

11   <u>Estelle v. McGuire</u>, 502 U.S. at 72, 112 S. Ct. 475 (1991), and fn 2, disapproving <u>Blair v.</u>

12   <u>McCarthy</u>, 881 F.2d 602 (9th Cir. 1989) (a case whose found error of failure to inform of a

13   mandatory parole term was based in state law).

14        Thus, in order for <u>Hicks</u> to be harmonized with the wall of post-AEDPA authority on the

15   irrelevance of state law, the state law in question must deal with an issue implicating the

16   fundamental fairness of a criminal proceeding.  Indeed, in <u>Hicks</u> itself, the issue in question

17   concerned the fundamental right to have a jury determine those matters which state law

18   commanded the jury to decide.  Because it has already been determined that the issue of

19   corroboration of accomplice testimony does not implicate fundamental fairness concerns, the

20   claims of lack of corroborating evidence and faulty accomplice instruction should be denied.

21        C. <u>Consciousness of Guilt Instruction</u>

22        The California appellate decision sets forth the basis and ruling upon this claim:

23        Overruling defendant's objection that the instructions were not supported
24   by the evidence, the trial court instructed the jury on consciousness of guilt
     (CALCRIM No. 371) and flight (CALCRIM No. 372) as follows:
25

26        "If the defendant tried to hide evidence, that conduct may show that he was
     aware of his guilt. If you conclude that the defendant made such an attempt, it is
27   up to you to decide its meaning and importance. However, evidence of such an
     attempt cannot prove guilt by itself." (CALCRIM No. 371.)
28

"If the defendant fled immediately after the crime was committed, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled cannot prove guilt by itself." (CALCRIM No. 372.)

On appeal, defendant again contends these instructions were not supported by sufficient evidence.

As the trial court cogently pointed out, "There is obviously one reasonable inference that the gun was hidden by [defendant]. The dominant facts supporting that would be his possession and really exclusive control of the firearm, shotgun in the early part ... and then certainly possession of it in the bag, at least, inferentially in the bag. [¶] There is [a] substantial amount of circumstantial evidence that would support conclusions that he had effective control of the firearm and [was] at the scene of the actual incident. [¶] He has apparent authority in the gang, plus the control of the house, at least, as exhibited by his presence and extending invitations to people to come over to the house et cetera, all that gives rise to the reasonable inference. One reasonable inference [is] that he hid the firearm, or it was hidden at his direction. Therefore, the instruction is appropriate."

With respect to the instruction on flight, the trial court noted there was testimony that after the shots were fired into Rosales's house, everyone ran away. In fact, there was testimony by Jenna that she specifically saw defendant running towards the Suburban after the shots were fired. Such testimony supported the giving of the instruction.

Defendant complains, however, that the evidence supporting the instructions came from the testimony of accomplices Tyler and Jenna, which testimony could not be used without the jury first finding independent corroborating evidence connecting defendant to the crimes. Defendant repeats his contention that there was insufficient independent corroboration of their testimony. We have rejected that claim.

Defendant goes on to argue that giving CALCRIM No. 371 and CALCRIM No. 372 "was akin to giving prejudicial pinpoint instructions because they each specifically referred to evidence that was at the core of the dispute in a way that instructed the jury they could use that to find defendant guilty." According to defendant, since his defense was that he did not commit the crimes, i.e., that Tyler and Jenna were lying about his participation, the consciousness of guilt instruction "erroneously allowed the jury to bolster the disputed issue of

13

identity with an inference of consciousness of guilt that was not independently tied to [defendant]."

Similarly, defendant claims the flight instruction should not have been given since it was dependent upon accomplice testimony for the identification of defendant. Defendant cites several cases which discuss whether a flight instruction is appropriate when identity is at issue in a case. (People v. London (1988) 206 Cal.App.3d 896, 902–906 [flight instruction appropriate if identity is not the only contested issue at trial]; People v. Scott (1988) 200 Cal.App.3d 1090, 1095 [flight instruction appropriate where evidence of subsequent flight from officers material to issues in case]; People v. Parrish (1986) 185 Cal.App.3d 942, 948 [flight instruction should not be given if identity is the only issue in a case].)

Defendant essentially contends these instructions improperly allowed the jury to consider flight and/or concealment of evidence in deciding the issue of identity, a sort of "bootstrapping" of evidence to find guilt.

We reject defendant's claims. First, identity was not the only issue contested in this case, which as we have noted, was tried both on a theory of direct action and a theory of aiding and abetting. Second, both CALCRIM No. 371 and CALCRIM No. 372 made it clear to the jury that it had to find it was defendant who made an attempt to hide evidence and/or who fled before it could consider whether such actions reflected a consciousness of guilt. And the jury was specifically instructed through CALCRIM No. 335 that the testimony of Tyler and Jenna required independent corroboration before their testimony could be used to find defendant guilty of the charged offenses. "Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions." (People v. Sanchez (2001) 26 Cal.4th 834, 852.) Finally, the jury was instructed that "[s]ome of these instructions may not apply, depending on your findings about the facts of the case. Do not assume just because I give a particular instruction that I am suggesting anything about the facts. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them." (CALCRIM No. 200.)

The trial court did not err in giving CALCRIM No. 371 and CALCRIM No. 372 over defendant's objection.

People v. Kirby at *9-11.

Petitioner raises the same issue here that he raised in the Court of Appeal—the evidence was insufficient to warrant the giving of consciousness of guilt instructions (both hiding evidence

1    and fleeing from the scene), and the instructions were too pin-pointed.  The undersigned has

2    much doubt that petitioner has stated a cognizable *federal* claim in the context of this case.

3           Generally, if an instruction such as the consciousness of guilt gives rise to a mandatory

4    presumption, e.g., hiding evidence conclusively shows that the defendant harbored a specific

5    intent, due process may be violated.  See Francis v. Franklin, 471 U.S. 307, 105 S. Ct. 1965

6    (1965); Niland v. Hall, 280 F.3d 6, 11 (1st Cir. 2002).  Perhaps, theoretically, a flight instruction,

7    along with others, could be so pinpointed/slanted as to reveal an untoward level of bias by the

8    trial court towards a defendant.  Outside of these areas, it is nearly impossible for a collateral-to-

9    the-elements-of-the-crime jury instruction requested by the prosecution to ever rise to the level of

10   a due process violation, i.e., imposing a fundamental unfairness when viewed as to the whole of

11   the instructions to the jury.  Estelle, supra at 72.

12          An instructive case involving one of the instructions here (CALCRIM 372) is Hussey v.

13   Long, 2014 WL 1330042 (C.D. Cal. Mar. 30, 2014).

14

15          The CALCRIM No. 372 instruction constituted a "permissive inference
     instruction" such that it "suggest[ed] to the jury a possible conclusion to be drawn
16   if the State prove[d] certain facts, but d[id] not require the jury to draw that
     conclusion." Francis v. Franklin, 471 U.S. 307, 314, 105 S.Ct. 1965, 85 L.Ed.2d
17   344 (1985). This instruction permitted the jury flexibility with respect to the flight
     evidence: The jury could exclude it from its consideration; it could accept or reject
18   such evidence; and, even if it accepted such evidence as true, the jury could give it
     any weight it so chose. Such permissive inference instructions are constitutional
19   unless the conclusion the instruction suggests "is not one that reason and common
     sense justify in light of proven facts before the jury." *Id*. at 314–15; see Hanna v.
20   Riveland, 87 F.3d 1034, 1037 (9th Cir.1996); United States v. Warren, 25 F.3d
     890, 897 (9th Cir.1994). A permissive inference instruction does not affect the
21   application of the "beyond a reasonable doubt" proof standard unless there is no
     rational way the jury could make the connection permitted by the inference. Cnty.
22   Court of Ulster Cnty. v. Allen, 442 U.S. 140, 162–67, 99 S.Ct. 2213, 60 L.Ed.2d
     (1979) (finding jury instruction constitutional after concluding that inference more
23   probably than not flowed from specific facts proven to jury at trial); Warren, 25
     F.3d at 899; see also Houston v. Roe, 177 F.3d 901, 910 (9th Cir.1999) (there
24   exists no "clearly established federal law as determined by the Supreme Court"
     prohibiting an instruction that would permit an inference of guilt from evidence of
25   flight).

26

27

28

                                             15

1

\*\*\*

2          Moreover, the CALCRIM No. 372 instruction given to the jury expressly

3  provided that evidence of flight was not, by itself, sufficient to support a finding of

4  guilt. (CT 158; 4 RT 858–59.) Indeed, the Ninth Circuit has observed that this

   clarification within the flight instruction may work to the benefit of a criminal

5  defendant because it emphasizes that other evidence, besides evidence of flight, is

6  required in order for the prosecution to meet its burden of proof as to the criminal

   defendant's guilt. <u>Karis v. Calderon</u>, 283 F.3d 1117, 1132 (9th Cir. 2002); <u>see also</u>

7  <u>United States v. Harrison</u>, 585 U.S. F.3d 1155, 1160 (9th Cir. 2009). Here, the

8  given CALCRIM No. 372 instruction did not create an impermissible mandatory

   presumption regarding petitioner's consciousness of guilt, nor did it relieve the

9  prosecution of its burden of proving every element of the crimes at issue beyond a

10  reasonable doubt. <u>See Francis</u>, 471 U.S. at 314–15. In these circumstances, the

   challenged instruction did not violate petitioner's due process right to a fair trial.

11  <u>See Karis</u>, 283 F.3d at 1132 (flight instruction did not violate due process where

12  court gave instructions regarding the evaluation of testimony and evidence and

   instruction stated that flight alone was insufficient to establish guilt); <u>McMillan</u>, 19

13  F.3d at 469 (flight instruction proper where court instructed jury it could draw

14  inference of guilt only if flight was proven); <u>Palma v. Harrington</u>, No. CV 11–

   5728–JHN (E) 2012 WL 1570805, \*7–10 (C.D.Cal. Feb. 24, 2012) (finding flight

15  instruction given to the jury did not violate the petitioner's due process rights),

16  Report and Recommendation adopted by 2012 WL 1570796 (C.D.Cal. May 2,

   2012); <u>Jackson v. Adams</u>, No. C 09–3202 MHP (PR) 2011 WL 2020251, at \*7

17  (N.D.Cal. May 24, 2011) (same). In light of the evidence and "in the context of the

18  instructions as a whole," the Court cannot conclude that the CALCRIM No. 372

   instruction rendered petitioner's trial fundamentally unfair. <u>McGuire</u>, 502 U.S. at

19  72.

20  <u>Hussey v. Long</u>, at 8-9.

21          Here, petitioner does not seriously contend, given the instructional caveats highlighted in

22  the Court of Appeal opinion, that the jury was instructed with an impermissible presumption.  Nor

23  does he contend a pervasive bias in the instructions.  He merely contends that the evidence was

24  insufficient to give the instruction, and generally not germane under state law to consciousness of

25  guilt—that is, the flight evidence/instruction overlapped with the important issue of whether the

26  defendant was in fact present at the scene of the crime.  These are not issues which give rise to

27  fundamental due process concerns.

28  /////

To be sure, the evidence of fleeing the scene was not highly probative of what turned out to be the critical issue at trial—at least with respect to the counts of conviction--the identity of the shooter at the scene.  Moreover, although the intent element of the count which was mistried (attempted murder) was very much at issue, even this count was not instructed very much by the running of the defendant (as well as all others), as the fleeing could just as much have been the result of discharging of the weapon *per se* as opposed to the discharge of the weapon with the additional intent to murder.   However, even assuming that the prosecution submittal of an instruction on flight was overkill on the intent issue, the instruction was relatively harmless as well.  The defendant attempted to show that the evidence he was at the scene was insufficient. The jury could believe this or not based on all facts.  If it were prepared to find that the defendant was not proven present at the scene, the fact that some people fled the scene would go no distance in deterring the jury from that finding.  Conversely, if the jury found that the defendant fled the scene based on the facts, it would have necessarily already found that the defendant was present at the scene, and the instruction on consciousness of guilt was superfluous to his identity.

Similarly, the hiding of the shotgun certainly was relevant in and of itself without any pin pointed instruction to show that defendant was likely at the scene, and more likely the shooter, as opposed to just being at the scene.  A fair inference could be drawn without specific instruction that a non-shooter, especially one not at the scene at all, would not have taken possession of the gun to hide it.  The fact that an instruction was given that the hiding of the weapon also indicated a consciousness of guilt--not an unreasonable inference in any event for the counts of conviction-- did little to affect the unquestioned permissible use of the evidence by the jury.

Something is either fundamental, or it is not.  Given that no situations are possible in this case where a consciousness of guilt instruction could infringe due process, the undersigned finds here that the protested instruction involves only a matter of state law, and presents no cognizable federal claim.

D. The Allen Instruction Was Not Deficient

Despite the fact that the most serious charge (attempted murder) was mistried due to jury non-unanimity, petitioner contends that the instruction by the trial judge to require further

17

deliberations when the jury thought itself deadlocked coerced the jury into finding him guilty on the two counts of conviction.  As respondent has thoughtfully briefed, such is not the case.

The background for the instruction given is as follows:

The evidentiary portion of defendant's trial was concluded on December 18, 2008, when both parties rested. The jury recessed until January 6, 2009, when it heard closing arguments. The jury began its deliberations on January 7, 2009.

On the third day of deliberations, January 12, 2009, at 9:43 a.m., the jury sent the trial court a written request that stated: "We have decided unanimously regarding count 3 [the felon in possession of a firearm offense]. We have thoroughly discussed count 2 [the section 246 offense] and are no longer making progress in the discussion toward a unanimous vote. We are currently discussing count 1 [the attempted murder offense]. If we are not able to decide on count 1 today—what do you suggest—what is the next course of action. We feel count 1 & 2 are so intertwined that we are unlikely to come to a unanimous decision on either. Please advise." After conferring with counsel, the trial court advised the jury to continue its deliberations.

Later the same day, at 2:26 p.m., the jury sent another communication to the trial court advising that it could not reach a unanimous vote on either count 1 or count 2. The jury included an unprompted numerical division of the jurors: "Charge 1—guilty 11 (eleven) not guilty 1(one). Charge 2—guilty 9 (nine) not guilty 3 (three)." As the trial judge was away from the courthouse and thus unavailable to respond, the jury recessed for the day.

The next day, the trial court met with counsel outside the presence of the jury to discuss the giving of a supplemental "firecracker" jury instruction requested by the prosecution. (People v. Moore (2002) 96 Cal.App.4th 1105, 1118–1120 (Moore).) Defendant objected to the proposed instruction on both federal and state constitutional grounds, including the right of due process, the right of trial by jury, the right to a unanimous jury, and the right to a fair trial.

The trial court noted the jury trial time, including opening and closing arguments, was 44 hours, which stretched over a number of days and weeks because of the holiday schedule, attorney conflicts, and the breaks necessitated by the dual jury trial. The court noted the jury had deliberated for roughly 15 hours up until the recess of the previous day, which included two hours of time hearing requested read-back of testimony. The trial court stated that such deliberation time was "comparatively short given the complexity of these charges, the subtlety of the

district attorney's theories and the duration of the evidentiary phase of its trial and, of course, that is only emphasized given the interruptions and the inherent difficulty that creates for the jurors as they search their memories and work to arrive at a verdict." The trial court acknowledged the jury ignored the standard admonition not to disclose the numerical breakdown of its vote, but concluded the volunteered information shows a "disproportionate break-out [that] lends some evidence to the fact that they may be close to a verdict." The trial court rejected defendant's specific criticisms of the language of the instruction. The trial court concluded the instruction was proper and gave the instruction, in language identical to the instruction approved in Moore, supra, 96 Cal.App.4th at pages 1118–1121 (an opinion of this court), over the objection of the defense.

The jury continued deliberations for the rest of the day. After less than an hour of deliberations the next day, the jury sent another note to the trial court indicating it was unable to come to a unanimous conclusion on the attempted murder charge. It had reached verdicts on the other two counts. After examining each juror, the court found the jury hopelessly deadlocked on the attempted murder charge and declared a mistrial on that count.

People v Kirby at *7-8.

The instruction given in its entirety provided:

It has been my experience on more than one occasion that a jury which initially reported it was unable to reach a verdict was ultimately able to arrive at a verdict.

To assist you in your further deliberations, I'm going to further instruct you as follows:  Your goals as jurors should be to reach a fair and impartial verdict if you are able to do so based solely on the evidence presented and without regard for the consequences of your verdict regardless of how long it takes to do so.

It is your duty as jurors to carefully consider, weigh, and evaluate all the evidence presented at the trial to discuss your views regarding the evidence and to listen to and consider the views of your fellow jurors.  In the course of your further deliberations, you should not hesitate to reexamine your own views or to request your fellow jurors to reexamine theirs.

You should not hesitate to change a view you once held if you are convinced it is wrong, or to suggest that other jurors changed (sic) their views if you are convinced they are wrong.

19

Fair and effective jury deliberations require a frank and forthright exchange of views.  As I previously instructed you, each of you must decide the case for yourself and you should do so only after a full and complete consideration of all the evidence with your fellow jurors.

It's your duties as jurors to deliberate with the goal of arriving at a verdict on the charge if you can do so without violence to your individual judgment.  Both the People and the defendant are entitled to the individual judgment of each juror.

As I previously instructed you, you have the absolute discretion to conduct your deliberations in any way you deem appropriate.

May I suggest that since you had not been able to arrive at a verdict using the methods that you have chosen[,] that you consider to change the methods you have been following at least temporarily and try a new method.  For example, you may wish to consider having different jurors lead the discussion for a period of time, or you may wish to experiment with reverse role playing by having those on one side of an issue present and argue the other side's position and vice versa.  This might enable you to better understand the other's position.

By suggesting you should consider changes in your methods of deliberation, I want to stress I'm not dictating or instructing you as to how conduct (sic) your deliberations.  I merely find that you may find it productive to do whatever is necessary to ensure each juror has a full and fair opportunity to express his or her views and consider and understand the views of the other jurors.

I also suggest you reread CALCRIM instructions 200 and 3550.  These instructions pertain to your duties as jurors and make recommendations on how you should deliberate.  The integrity of a trial requires that jurors at all times during deliberations conduct themselves as required by the instructions.  CALCRIM instruction 200 and 3550 define the duties of a jury.

The decision the jury renders must be based on the facts and the law.  You must determine what facts have been proved from the evidence received in the trial and not from any other source.  A fact is something proved by the evidence or stipulation.

Second, you must apply the law I state to you to the facts as you determine them and in this way arrive at your verdict.  You must accept and follow the law as I state it to you regardless of whether you agree with the law.

If anything concerning the law said by the attorneys in their argument or at any other time during the trial conflicts with my instructions on the law, you must follow my instructions.

CALCRIM 3550 defines the jury's duty to deliberate.  The decisions you make in this case must be based on the evidence received in the trial and the instructions given by the Court.  These are matters this instruction requires you to discuss for the purpose of reaching a verdict.

CALCRIM 3550 also recommends how jurors should approach their task. You should keep in mind the recommendations this instruction suggests when considering the additional instructions, comments and suggestions I have made in the instructions now presented to you.

I hope my comments and suggestions may have some assistance to you (sic).  You are ordered to continue your deliberations at this time.  If you have other questions, concerns, requests, or any communications you desire to report to me, please put those in writing on the form my court attendant has provided to you[,] have them signed and dated by your foreperson and then please notify the Court attendant.  Thank you.

RT 1726-1729

The propriety of the instruction in the circumstances here is dictated by the very similar case of <u>Parker v. Small</u>, 665 F.3d 1143 (9th Cir. 2011), a case also involving the <u>People v. Moore</u> instruction.  Because its analysis fits this case, the undersigned will quote it at length:

Clearly established federal law provides that "[a]ny criminal defendant ... being tried by a jury is entitled to the uncoerced verdict of that body." <u>Lowenfield v. Phelps</u>, 484 U.S. 231, 241, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988). A supplemental jury charge to encourage a deadlocked jury to try to reach a verdict is not coercive per se. <u>Allen v. United States</u>, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896) (approving the "<u>Allen</u> charge"); <u>Lowenfield</u>, <u>supra</u>, 484 U.S. at 237, 108 S.Ct. 546 ("The continuing validity of this Court's observations in <u>Allen</u> are beyond dispute ..."). However, when faced with a claim of jury coercion, a reviewing court must "consider the supplemental charge given by the trial court 'in its context and under all the circumstances.' " <u>Lowenfield</u>, <u>supra</u>, 484 U.S. at 237, 108 S.Ct. 546 (quoting <u>Jenkins v. United States</u>, 380 U.S. 445, 446, 85 S.Ct. 1059, 13 L.Ed.2d 957 (1965) (per curiam)).

In <u>Lowenfield</u>, the trial judge polled the individual jurors to learn what

each juror thought about his or her ability to reach a sentencing recommendation in a capital case if given more time to deliberate. 484 U.S. at 234–35, 108 S.Ct. 546. Only one juror felt that further deliberation was unnecessary. After learning that fact, the judge reminded the jury that in the absence of a unanimous jury recommendation, the court would impose a sentence of "Life Imprisonment without benefit of Probation, Parole, or Suspension of Sentence." Id., 108 S.Ct. 546. Thirty minutes later, the jury returned with a verdict sentencing the defendant to death. Id., 108 S.Ct. 546.

In upholding the denial of the habeas writ, the Supreme Court found that the Lowenfield instruction was less coercive than the Allen instruction because the judge did not specifically urge the minority jurors to consider the majority's view or the reasonableness of their own view during the supplemental charge. Id. at 237–38, 108 S.Ct. 546. The Supreme Court was similarly unpersuaded by the fact that the trial judge knew the identity of the single juror who disfavored continued deliberation because the trial judge did not know how that individual felt about the merits of the case—which the Court determined to be "clearly separate" inquiries. Id. at 240, 108 S.Ct. 546. While the Court noted that a short time lapse between the presentation of supplemental charges and the jury's return with a verdict suggests coercion, that fact is just one part of the totality of the circumstances analysis the Supreme Court requires for determining the presence of jury coercion. Id., 108 S.Ct. 546. Ultimately, the Lowenfield Court found that the supplemental charge, even in the context of the judge's knowledge about each juror's desire to continue deliberating and the short time lapse between instruction and verdict, was not coercive. Adhering to the Lowenfield Court's guidance, we ask (1) if the California Court of Appeal looked at the totality of the circumstances in determining whether the instruction given at Parker's trial was coercive and (2) if its determination that it was not was objectively reasonable.

It is clear from the record that the California Court of Appeal considered the Moore instruction and its potentially coercive effect in context and under all the circumstances. The California Court of Appeal began by finding that the Moore instruction had been previously upheld and endorsed in California. Then the Court considered a line of this Circuit's precedent FN1 for determining whether the trial judge's knowledge of a single holdout made the Moore instruction coercive. After looking at this Circuit's precedent, the instruction given at trial, and the circumstances surrounding the presentation of the instruction, the California Court of Appeal concluded that the supplemental charge did not coerce the jury.

FN1. Although the California Court of Appeal did not cite any Supreme Court authority in its decision, we ask only whether it reasonably applied the

principles contained in relevant Supreme Court precedent. See Early v. Packer, supra, 537 U.S. at 8, 123 S.Ct. 362.

As long as the California Court of Appeal reviewed all the facts, and considered the supplemental charge in its context and under all the circumstances in holding that it was not coercive, then, in the absence of Supreme Court authority to the contrary, this Court must give deference to the California Court of Appeal's judgment. See Woodford v. Visciotti, 537 U.S. 19, 24, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (noting that the 28 U.S.C. § 2254(d) is a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt") (citations and internal quotations omitted) (per curiam). We offer no opinion as to whether we would have reached the same result had we been reviewing this case directly. We hold only that the California Court of Appeal's decision is not contrary to, and does not involve an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States.

III. Smith v. Curry Distinguished

We also find it appropriate to distinguish the present case from Smith v. Curry, 580 F.3d 1071 (9th Cir. 2009), cert. denied, ⸺ U.S. ⸺, 131 S.Ct. 10, 178 L.Ed.2d 403 (2010), a case decided by this Circuit with facts somewhat similar to the present case. In Smith, a divided panel affirmed the district court's grant of habeas relief, holding that a California Court of Appeal decision upholding a trial judge's actions was an objectively unreasonable application of governing legal principles set forth in Lowenfield. Smith is clearly distinguishable from this case.

In the Smith case, as here, the trial judge knew both the division of the jurors and the reason for a single holdout juror's reluctance to convict. 580 F.3d at 1082. The Smith trial judge, however, went beyond an Allen charge to revisit select pieces of evidence from the trial, and to explain that evidence in a way highly favorable to the prosecution. Id. The judge did this with knowledge that the evidence he was highlighting directly responded to the holdout juror's concerns. In fact, he replayed for the jury certain interrogations that would support a conviction, and, without being asked to do so, sent transcripts of those interrogations back to the jury room. Id. The panel majority said this recasting of evidence by the judge essentially "substituted the judge for the jury as to the manner and substance of deliberations and thereby denied [the defendant] his constitutional right to the uncoerced verdict of the jury." Id. at 1084. Lastly, it took the jury less than one hour to return with a guilty verdict after being given these supplemental instructions by the trial judge. Id. at 1083–84.

1

2          Given all of these facts, <u>Smith</u> found that the California Court of Appeal's
   decision that the judge's presentation of the evidence was "scrupulously fair," was
3   objectively unreasonable, and accordingly, so too was the Court of Appeal's
   decision regarding the lack of jury coercion. <u>Id.</u> at 1084. Smith concluded that
4   "[a]bsent these factors, we might reach a different conclusion. With them, the case
   represents the most coercive instruction of any in the coercion cases we have
5   reviewed." <u>Id.</u>
6

7          The judge in Parker's trial did not go nearly as far to encourage the jury to
   reach a verdict as the trial judge did in <u>Smith</u>. Several of the factors that led this
8   court to grant the writ in <u>Smith</u> are absent from this case. For example, while it is
   true that Parker's trial judge knew the jurors were split, that one juror was in favor
9   of acquittal, and that that one juror was concerned about the believability of the
   prosecution's witnesses, the judge did not, as did the trial judge in Smith, directly
10   address that holdout juror's concerns during the supplemental instruction or
11   attempt to recast the evidence in a light more favorable to the prosecution.
   Whether or not the California Court of Appeal was correct to conclude that there
12   was no coercion here, its decision did not involve an objectively unreasonable
13   application of the governing principles set forth in <u>Lowenfield</u>.
14

15   <u>Parker v. Small</u>, 655 F.3d at 1147-1149.

16          There is no appreciable difference between the circumstances in this case and that of

17   <u>Parker</u> with the exception that we do know that the lone juror was not coerced with respect to the

18   most serious count because this juror held firm in his/her acquittal position.  Moreover, the jury

19   did not return right away so as to possibly indicate a compromise verdict involving the holdout

20   jurors on Count 2, one of which was presumably the lone holdout on Count 1.  The trial judge did

21   not supplement the "further deliberation" instruction with his take on the evidence, nor did he

22   directly pose the supplemental instruction to the holdout jurors—his terms were neutral.  While it

23   would have been better for the supplemental instruction to have included "on the other hand"

24   words to the effect that a juror should not change his believed stance solely to reach a verdict, the

25   instruction did direct that any verdict should not do "violence to your individual judgment."

26          For all of these reasons, the Court of Appeal analysis cannot be deemed AEDPA

27   unreasonable.

28

1    *Conclusion*

2        IT IS HEREBY RECOMMENDED that the habeas petition should be denied.  No

3    Certificate of Appealability should issue.

4        These findings and recommendations are submitted to the United States District Judge

5    assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days

6    after being served with these findings and recommendations, any party may file written

7    objections with the court and serve a copy on all parties.  Such a document should be captioned

8    "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

9    shall be served and filed within fourteen days after service of the objections.  The parties are

10   advised that failure to file objections within the specified time may waive the right to appeal the

11   District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

12

13   DATED: September 9, 2014

14                                        /s/ Gregory G. Hollows

15                          UNITED STATES MAGISTRATE JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28